# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Joel Hegarty, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. This affidavit is submitted to support the issuance of a criminal complaint charging that, from a time unknown, but at least as early as on or about October 7, 2025, through and including on or about April 16, 2026, in the State and District of Colorado, JEREMMY ANDRES BOSCAN-DELFIN and WILMER JOSE BOLANO-SANCHEZ, did knowingly and intentionally conspire and agree with each other and with Coconspirator 1, with interdependence, to ship, transport, transfer, cause to be transported, and otherwise dispose of a firearm to another person, in and otherwise affecting interstate and foreign commerce, having reasonable cause to believe that the use, carrying, and possession of the firearm by the recipient would constitute a felony; all in violation of Title 18, United States Code, Sections 933(a)(1) and (3).

2. This affidavit also is submitted to support the issuance of arrest warrants for JEREMMY ANDRES BOSCAN-DELFIN and WILMER JOSE BOLANO-SANCHEZ.

## AGENT BACKGROUND

3. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, Denver, Colorado. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated by statute in the United States Code.

4. I have been employed as a Special Agent with ATF since February 2020. My primary duties consist of the enforcement of federal firearms laws, armed narcotics trafficking laws, and conspiracy laws, and I have conducted numerous investigations regarding these laws

as an ATF Special Agent. Prior to graduating from the Federal Law Enforcement Training Center in 2020 and becoming an ATF Special Agent, I was employed with Ernst and Young for over 4 years, working as a Senior Forensic Accountant in Ernst and Young's forensic accounting practice. I have participated in numerous investigations involving violent crime, organized crime, illegal firearms possession, firearms trafficking, the use and trafficking of narcotics, armed narcotics trafficking, and criminal conspiracies involving these offenses.

5. My duties as an ATF Special Agent include the development and evaluation of information to detect criminal organizations engaged in the illegal manufacture and/or distribution of controlled substances in the United States, as well as identification of the proceeds of such illegal conduct and the laundering of those proceeds. As an ATF Special Agent, I have participated in firearms trafficking and narcotics investigations and in the execution of arrests and search warrants related to those criminal activities. I have performed surveillance, including observing and recording the movements of persons trafficking in firearms and drugs. I have participated in operations involving controlled purchases, undercover transactions, and undercover communications with subjects under investigation. I have been involved in and reviewed interviews of individuals engaged in firearms and narcotics offenses, their associates, confidential informants, and other witnesses. I have become familiar with methods and techniques commonly used by drug traffickers and firearms traffickers, including coded language used in such transactions, methods drug traffickers and firearms traffickers use to distribute drugs or firearms, respectively, and methods drug traffickers and firearms traffickers use to conceal their activities from law enforcement.

6. The facts in this affidavit come from my personal observations, my review of audio and/or video recordings and recorded communications from this investigation, and

information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is probable cause for the requested complaint and arrest warrants, and it does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

7. The United States, including the ATF, the Drug Enforcement Administration (DEA), and Homeland Security Investigations (HSI), is conducting a criminal investigation of several subjects involved in drug trafficking and firearms trafficking offenses in the Denver, Colorado area and elsewhere. Those subjects include WILMER JOSE BOLANO-SANCHEZ, JEREMMY ANDRES BOSCAN-DELFIN, and Coconspirator 1.[1]

8. In late 2025, a Confidential Informant ("CI") advised me that the CI was in communication with an individual who purported to be engaged in firearms and drug trafficking activities in the Denver metro area. I directed the CI to continue engaging in communications with the individual to coordinate purchases of evidence from the individual. The CI has been given monetary compensation in exchange for giving law enforcement information on criminal activities on dozens of prior occasions. The CI has provided reliable information on the prior occasions, and no information provided by the CI has subsequently proven false. The CI is not trying to reduce any sentence in exchange for his/her cooperation. The CI has past felony convictions, but none within the last nine years, and none involving falsehoods or deception.

9. According to the CI, he/she began communicating with an individual, who ultimately was identified as Coconspirator 1, on or about August 8, 2025. Over the course of the next several weeks, the CI and Coconspirator 1 engaged in recorded communications over

[1] Coconspirator 1 lives outside the State of Colorado, and has been involved in coordinating firearms transactions, through other individuals, across multiple cities in the United States.

WhatsApp, in which Coconspirator 1 purported to be involved in firearms trafficking activities with his criminal associates.

10. Beginning in October 2025, ATF undercover agents (UCs) conducted numerous undercover meetings with subjects in this investigation. During these undercover meetings, UCs purchased a variety of items, including firearms, ammunition, firearms parts and accessories, suspected cocaine, suspected tusi (a narcotic that is known to contain ketamine), and suspected methamphetamine. The following paragraphs describe some, but not all, of the undercover meetings and transactions in the investigation.

11. The CI's communications with Coconspirator 1 and certain subjects in this investigation, including WILMER JOSE BOLANO-SANCHEZ, JEREMMY ANDRES BOSCAN-DELFIN, and Coconspirator 1, primarily have been conducted in Spanish. The information in this affidavit about the contents of those communications is based on interpretations or summaries provided by the CI in real-time during undercover meetings or oral summaries the CI provided to ATF Special Agents following the CI's communications with the subjects.

12. As discussed below, between October 2025 and April 2026, WILMER JOSE BOLANO-SANCHEZ and/or JEREMMY ANDRES BOSCAN-DELFIN sold a total of seven firearms, including two firearms with obliterated serial numbers, to the UC. BOLANO-SANCHEZ and/or BOSCAN-DELFIN also sold the UC several high-capacity firearm magazines, including a 60-round drug magazine, and ammunition. The UC and CI repeatedly told BOLANO-SANCHEZ and BOSCAN-DELFIN that the UC was taking the weapons down to Mexico, and the UC made comments about people in Mexico liking certain features, including one comment about people in Mexico liking firearms without a serial number. In addition, as

discussed below, the UC purchased "tusi" from BOSCAN-DELFIN and discussed with BOSCAN-DELFIN and BOLANO-SANCHEZ the UC's purported plans to distribute the tusi to others and purchase additional tusi to distribute to others. The UC was a purported drug trafficker who was buying firearms—including firearms with obliterated serial numbers—in cash, without requesting identification or any paperwork for the sale, and BOSCAN-DELFIN and BOLANO-SANCHEZ had reasonable cause to believe that the use, carrying, or possession of the firearms by the UC would constitute a felony.

***Undercover Purchase – October 7, 2025***

13. Leading up to October 7, 2025, the CI engaged in WhatsApp communications with Coconspirator 1 regarding purchasing multiple firearms. On October 7, 2025, during recorded communications between Coconspirator 1 and the CI, Coconspirator 1 advised the CI that other individuals would be meeting with the CI to sell a firearm. A time and meeting location was agreed upon in communications between Coconspirator 1 and the CI, and then Coconspirator 1 directed two initially unidentified individuals (subsequently identified as BOLANO-SANCHEZ and BOSCAN-DELFIN[2]) to a store parking lot located on Mississippi Ave. in Aurora, Colorado. When the CI and UC arrived at the meeting location, the CI received a call from BOSCAN-DELFIN describing the type of car that they were in, specifically a black Ford Escape SUV.

14. The UC observed a black Ford Escape SUV occupied by two Hispanic males in the store parking lot. The UC parked the UC's vehicle in a parking space near the Ford Escape SUV. BOLANO-SANCHEZ and BOSCAN-DELFIN subsequently exited the Ford Escape SUV.

---

[2] A section on how law enforcement officers identified BOLANO-SANCHEZ and BOSCAN-DELFIN is included later in the Probable Cause section under the heading "Identification of the Targets."

15. BOSCAN-DELFIN walked around to the passenger side of the Ford Escape SUV and obtained a purple backpack from the Ford Escape. BOSCAN-DELFIN handed the purple backpack to BOLANO-SANCHEZ, and BOLANO-SANCHEZ entered the rear seat of the UC's vehicle with the backpack. BOSCAN-DELFIN remained standing next to the rear open door of the UC's vehicle while conversing with the CI and UC.

16. While the CI and UC were meeting with BOLANO-SANCHEZ and BOSCAN-DELFIN, the CI had a call with Coconspirator 1, which the CI placed on speakerphone. During the call, Coconspirator 1 conversed with the CI and provided directions to BOLANO-SANCHEZ and BOSCAN-DELFIN.

17. Once the UC confirmed that the UC had the money to pay for the firearm, BOLANO-SANCHEZ removed a black firearm case from the purple backpack. BOLANO-SANCHEZ opened the case to show the firearm and two magazines to the UC and the CI. The CI asked about an extended magazine that had been in a photograph Coconspirator 1 previously sent to the CI. BOSCAN-DELFIN said that the firearm did not come with that magazine. The UC then said, in English, "In Mexico, Glocks, big clips—we take them down there and they pay more for any of that shit." The CI then explained what the UC said to BOSCAN-DELFIN and BOLANO-SANCHEZ in Spanish.

18. The UC handed $1,100 in prerecorded U.S. currency to BOLANO-SANCHEZ, and the CI took the firearm and firearm case from BOLANO-SANCHEZ. BOLANO-SANCHEZ counted the money from the UC, and then handed the money to BOSCAN-DELFIN. BOLANO-SANCHEZ then exited the UC's vehicle, and BOLANO-SANCHEZ and BOSCAN-DELFIN returned to their Ford Escape SUV.

19. The firearm that BOLANO-SANCHEZ and BOSCAN-DELFIN sold to the UC and CI was a Glock, model 42, .380 caliber pistol, and it had an obliterated serial number. An image of the firearm is below.



***Undercover Purchase – October 23, 2025***

20. After the undercover purchase on October 7, 2025, the CI began communicating with BOSCAN-DELFIN over a WhatsApp account ending in -7685 (hereafter, "BOSCAN-DELFIN'S WhatsApp Account"), and the CI continued communicating with Coconspirator 1 over Coconspirator 1's WhatsApp account. During the CI's WhatsApp communications with BOSCAN-DELFIN, BOSCAN-DELFIN referred to having a .45 caliber firearm for sale and the possibility of getting a 9mm firearm to sell. BOSCAN-DELFIN also sent images of two firearms to the CI. On October 15, 2025, while BOSCAN-DELFIN and the CI were discussing arranging another meeting, the CI again referred to the UC bringing the weapons to Mexico. The CI sent a message to BOSCAN-DELFIN discussing a potential time for a meeting the next day and explaining that if that time did not work, "it will have to wait until next week, because he is taking the weapons he currently has with him to Mexico."

21. The CI continued to communicate over WhatsApp with BOSCAN-DELFIN and Coconspirator 1. On or about October 23, 2025, BOSCAN-DELFIN also sent the CI contact

information for BOLANO-SANCHEZ’S WhatsApp account, ending in -9706 (hereafter, “BOLANO-SANCHEZ’S WhatsApp Account”). The CI then began communicating with BOLANO-SANCHEZ over BOLANO-SANCHEZ’S WhatsApp account too.

22. On or about October 23, 2025, the CI, BOLANO-SANCHEZ, and BOSCAN-DELFIN agreed to meet at a parking lot in the Denver area at an agreed-upon time for another firearm transaction. Later that day, BOLANO-SANCHEZ arrived at the parking lot in a black Honda Civic bearing Colorado Temporary license plate number 7626387.

23. BOLANO-SANCHEZ met with the CI and the UC in the parking lot. The meeting was covertly video and audio recorded. During the meeting, BOLANO-SANCHEZ provided a firearm, specifically an Armscor of the Philippines (Squires Bingham), model Charles Daly, .45 caliber pistol bearing serial number CD014473, to the UC. BOSCAN-DELFIN previously sent an image of what appeared to be this same firearm to the CI over BOSCAN-DELFIN’S WhatsApp Account. A picture of the firearm purchased during the October 23, 2025 transaction is below.



***Undercover Purchase – November 19, 2025***

24. Leading up to November 19, 2025, the CI engaged in WhatsApp communications with BOLANO-SANCHEZ regarding purchasing additional firearms. These communications occurred in recorded communications with BOLANO-SANCHEZ'S WhatsApp Account.

25. On or about November 19, 2025, the CI and BOLANO-SANCHEZ agreed to meet at an ATF controlled undercover location (the "UC Location") at an agreed-upon time for another transaction. Later that day, BOLANO-SANCHEZ arrived at the UC Location. The November 19, 2025 meeting with BOLANO-SANCHEZ was covertly video and audio recorded.

26. The CI met with BOLANO-SANCHEZ outside the UC Location. BOLANO-SANCHEZ said that he had parked around the corner and had left the firearm in the vehicle. BOLANO-SANCHEZ and the CI entered the UC Location and met with the UC. BOLANO-SANCHEZ then made a call to an unknown individual and directed the individual to bring the firearm to BOLANO-SANCHEZ. A few minutes later, a black Honda sedan driving by an unidentified Hispanic female pulled up near the UC Location. BOLANO-SANCHEZ briefly met with the driver of the vehicle. The driver handed BOLANO-SANCHEZ a brown paper shopping bag, and BOLANO-SANCHEZ carried the bag into the UC Location. BOLANO-SANCHEZ put the paper bag on a counter for the UC.

27. Inside was a plastic shopping bag containing a firearm and a rifle magazine. The UC removed the firearm from the bags and began examining the firearm. BOLANO-SANCHEZ briefly returned to speak with the driver of the Honda sedan, and he then returned to meet with the UC and CI.

28. The UC pointed out to BOLANO-SANCHEZ the area on the firearm where the serial number was obliterated and noted, "They like this shit because there's no numbers on it."

The CI explained this to BOLANO-SANCHEZ in Spanish. BOLANO-SANCHEZ agreed and responded that it had taken longer to get the firearm because the serial number was being removed.

29. During the transaction. BOLANO-SANCHEZ confirmed that the price of the firearm was $2,500 and asked for an additional amount for gas. The UC counted $2,600 in prerecorded U.S. currency, and provided it to BOLANO-SANCHEZ. After paying for the firearm, the UC, pointing to the area where the serial number should be, said, “This type of shit, that’s what they pay more for in Mexico, so I’ll take this down there tomorrow.” The CI translated this into Spanish for BOLANO-SANCHEZ. BOLANO-SANCHEZ nodded, shook hands with the CI and UC, and then exited the UC Location.

30. The firearm BOLANO-SANCHEZ sold to the UC during this transaction was an American Tactical, model Omni Hybrid, Multi-Cal .223/5.56mm caliber pistol, with an obliterated serial number. An image of the firearm and rifle magazine is below.



***Undercover Purchase – January 13, 2026***

31. Leading up to January 13, 2026, the CI continued to communicate with BOLANO-SANCHEZ and BOSCAN-DELFIN, over their respective WhatsApp Accounts, regarding additional transactions.

32. On or about January 13, 2026, the CI, BOLANO-SANCHEZ, and BOSCAN-DELFIN agreed to meet at the UC Location at an agreed-upon time for another transaction. Later that day, BOLANO-SANCHEZ and BOSCAN-DELFIN arrived at the UC Location in a black Honda Civic bearing Colorado license plate number EMDR68. BOLANO-SANCHEZ was the driver of the black Honda Civic, and BOSCAN-DELFIN got out of the front passenger seat of the black Honda Civic.

33. BOSCAN-DELFIN and BOLANO-SANCHEZ then met with the CI and UC at the UC Location. The meeting was covertly audio and video recorded.

34. BOSCAN-DELFIN gave the CI and UC several small baggies containing a pink substance, which I recognize from my training and experience as a drug known as "tusi." The UC observed that the narcotics were packaged in several smaller plastic baggies typically used by narcotics dealers for individual distribution and sales based upon the experience of the UC. The UC used a digital scale to weigh the tusi, and BOSCAN-DELFIN confirmed that the tusi cost $300.

35. As the UC was obtaining the money to pay for the tusi, the UC and CI engaged BOSCAN-DELFIN and BOLANO-SANCHEZ in additional discussion regarding the tusi. The UC and CI told BOSCAN-DELFIN and BOLANO-SANCHEZ that they were going to take the tusi down to Colorado Springs to sell.

36. BOSCAN-DELFIN briefly returned to the Honda Civic and retrieved a backpack. BOSCAN-DELFIN then brought the backpack into the UC Location. BOSCAN-DELFIN then removed a two tone silver and black pistol from the backpack and handed the firearm to the CI, who placed the firearm on the counter for the UC to examine.

37. The UC paid $300 for the tusi and an additional $1,100 for the firearm to BOSCAN-DELFIN. After making the payment, the UC and CI discussed that the UC was going to bring the tusi to a club in Colorado Springs. The UC and the CI talked to BOSCAN-DELFIN about BOSCAN-DELFIN'S ability to provide more tusi if the girls liked it. BOSCAN-DELFIN provided a price per ounce for tusi, and noted that he could get additional tusi for the UC and CI quickly. BOSCAN-DELFIN and BOLANO-SANCHEZ then left the UC Location and returned to the Honda Civic.

38. The firearm BOSCAN-DELFIN sold to the UC during the January 13, 2026 transaction was a Smith & Wesson Model SW40VE .40 caliber pistol bearing serial number RBF1379. The tusi he sold was later provided to the Drug Enforcement Administration Southwest Laboratory for lab testing. It tested positive for the presence of ketamine and MDMA, with a net weight of approximately 4.469 grams. A picture of the tusi and firearm from the January 13, 2026 purchase is below.



***Undercover Purchase – April 2, 2026***

39. Leading up to April 2, 2026, the CI engaged in additional communications with BOLANO-SANCHEZ over BOLANO-SANCHEZ'S WhatsApp account regarding additional transactions.

40. On or about April 2, 2026, the CI and BOLANO-SANCHEZ agreed to meet at the UC Location at an agreed-upon time for another transaction. Later that day, BOLANO-SANCHEZ arrived at the UC Location in the same black Honda Civic. An unidentified female remained in the front passenger seat of the Honda Civic while BOLANO-SANCHEZ went inside the UC Location and met with the UC and CI.

41. The meeting between BOLANO-SANCHEZ and the UC and CI at the UC Location was covertly video and audio recorded. BOLANO-SANCHEZ entered the UC Location carrying a shoulder bag. BOLANO-SANCHEZ had a brief conversation with the UC and CI about vehicles. BOLANO-SANCHEZ then asked the UC to close the door to the UC Location. The UC did so.

42. BOLANO-SANCHEZ then removed several items from his bag and placed them on the counter where he was meeting with the UC and CI. Specifically, BOLANO-SANCHEZ provided two pistol magazines, including one high-capacity magazine, and two black socks containing a two-tone Glock pistol and 36 rounds of 10 mm caliber ammunition. The firearm was a Glock, model 29, 10mm caliber pistol, bearing serial number BUDD031. A picture of the firearm, magazines, and ammunition is below.



43. The UC paid BOLANO-SANCHEZ $1,500 in prerecorded U.S. currency for the firearm, magazines, and ammunition. During conversation about the firearms, BOLANO-SANCHEZ said that his source for firearms was a "white boy," and BOLANO-SANCHEZ said he would ask his source about prices for "switches," which I know from my training and experience is a reference to machinegun conversion devices. The UC and CI again talked to BOLANO-SANCHEZ about how the UC was taking firearms down to Mexico to sell.

***Undercover Purchase – April 16, 2026***

44. Leading up to April 16, 2026, the CI continued to communicate with BOLANO-SANCHEZ over BOLANO-SANCHEZ'S WhatsApp Account regarding additional transactions.

On or about April 16, 2026, the CI and BOLANO-SANCHEZ agreed to meet at the UC Location at an agreed-upon time for another transaction. Later that day, BOLANO-SANCHEZ arrived at the UC Location in the same black Honda Civic.

45. The meeting between BOLANO-SANCHEZ, the UC, and CI at the UC Location was covertly video and audio recorded. During the meeting, BOLANO-SANCHEZ removed several items from a black duffel bag and placed them on the counter where he was meeting with the CI and UC. The items included two firearms, specifically a CAI/Romarm Cugir, model Mini Draco, 7.62 caliber pistol bearing serial number PE94092019RO, and a Taurus, model G3C, 9mm caliber pistol, bearing serial number AEJ713413. The items also included a 60-round drum magazine, an additional high-capacity magazine, a plastic bag containing approximately 47 rounds of 7.62 mm caliber ammunition, and a plastic bag containing approximately six rounds of 9mm caliber ammunition. A picture of those items is below.



46. The UC and CI talked to BOLANO-SANCHEZ about how the UC would be taking the firearms and drum magazine down to Mexico. The UC and CI explained that the UC would pay BOLANO-SANCHEZ extra for the drug magazine. BOLANO-SANCHEZ then used his cell phone to take a photograph of the drug magazine. The UC paid BOLANO-SANCHEZ a total of $3,700 for the items.

***Interstate Nexus for Recovered Firearms***

47. Based on my training and experience and information from ATF Special Agents who have specialized training and experience in determining the manufacturer and origin of firearms, I know that the firearms described above, except for those firearms that were privately made or contain no make, model, or serial numbers, were not manufactured in the state of Colorado. Therefore, the firearms traveled in and/or affected interstate and/or foreign commerce prior to being sold to the UC or CI in Colorado, as discussed above.

***Identification of the Targets***

48. This section explains how law enforcement officers identified the targets discussed above.

a. *BOLANO-SANCHEZ:* A query was conducted of the phone number associated to BOLANO-SANCHEZ'S WhatsApp Account. The query showed possible open source social media accounts for Facebook, with username "Wilmer Jose" and Instagram with username "Wilmerjosebolano." Based on these identifiers, law enforcement database queries were conducted for "Wilmerjosebolano." A Colorado Department of Motor Vehicles (DMV) driver's license query revealed a Colorado Driver's License attributable to a "WILMER JOSE BOLANO SANCHEZ." Investigators and the UC recognized the person depicted in the Driver's License photograph as the person who the UC had met with during the transactions discussed above.

b. *BOSCAN-DELFIN:* After identifying BOLANO-SANCHEZ, an open-source review of BOLANO-SANCHEZ'S Instagram account "Wilmerjosebolano" showed an associated account with the account username "Jeremy_andres24" and additional account name "Jeremy Andres Boscan." A review of this account showed an individual who appeared to be the same individual who met with the UC and CI on multiple occasions as described above. The individual was observed wearing the same white and blue Chicago Bulls hat that was worn by the suspect on October 7, 2025. Based on these identifiers, law enforcement database queries were conducted for "Jeremy Andres Boscan." A Colorado Department of Motor Vehicles (DMV) driver's license query revealed a Colorado Driver's License attributable to a "JEREMMY ANDRES BOSCAN-DELFIN," but with no associated photograph. Investigators obtained a known photograph for JEREMMY ANDRES BOSCAN-DELFIN from HSI. Investigators and the UC recognized the person depicted in the photograph from HSI as the person who the UC had met with during the transactions discussed above.

c. *Coconspirator 1*: ATF agents initially identified Coconspirator 1 based on information received from HSI investigators conducting an investigation of Coconspirator 1 in the Nashville, Tennessee area. A UC also met with Coconspirator 1 in person in the Denver area on one occasion since October 2025. Based on HSI's investigation of Coconspirator 1 in the Nashville area, which includes evidence recovered from cloud warrants, phone toll analysis, and witness statements, as well as the training, experience, and review of law enforcement reports by agents in that investigation, agents in the Nashville investigation believe Coconspirator 1 may be an associate of Tren De Aragua ("TdA")—which is a trans-national criminal organization from Venezuela that has been designated as a Foreign Terrorist Organization by the United States on or about February 20, 2025—and/or an associate of a TdA splinter faction known as "Anti-

Tren"—which is comprised of current and former members of TdA who are operating without or against the authority of TdA leadership in Venezuela.

**CONCLUSION**

49. Based on the aforementioned information, I submit that probable cause exists to believe that, from a time unknown, but at least as early as on or about October 7, 2025, through and including on or about April 16, 2026, in the State and District of Colorado, JEREMMY ANDRES BOSCAN-DELFIN and WILMER JOSE BOLANO-SANCHEZ, did knowingly and intentionally conspire and agree with each other and with Coconspirator 1, with interdependence, to ship, transport, transfer, cause to be transported, and otherwise dispose of a firearm to another person, in and otherwise affecting interstate and foreign commerce, having reasonable cause to believe that the use, carrying, and possession of the firearm by the recipient would constitute a felony; all in violation of Title 18, United States Code, Sections 933(a)(1) and (3).

50. As such, I respectfully request that the Court issue the criminal complaint and corresponding arrest warrants for JEREMMY ANDRES BOSCAN-DELFIN and WILMER JOSE BOLANO-SANCHEZ.

[Continued on the next page.]

I, Joel N. Hegarty, Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, hereby depose and state that the above-mentioned information is true to the best of my information, knowledge and belief.

*s/ Joel N. Hegarty*
Joel N. Hegarty
ATF Special Agent

Submitted, attested to, and acknowledged by reliable electronic means this 28th day of April, 2026.

Timothy P. OHara Digitally signed by Timothy P. OHara
Date: 2026.04.28 16:37:49 -06'00'

TIMOTHY P. O'HARA
United States Magistrate Judge
District of Colorado

**This affidavit and criminal complaint was reviewed and is submitted by Talia Bucci, Assistant United States Attorney.**